**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**WENDY V.,**

                                        **Plaintiff,**

        **vs.**                                                     **5:22-CV-1185**
                                                                        **(LEK)**


**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**
_____

**Lawrence E. Kahn,**
**Sr. U.S. District Judge**


## DECISION & ORDER

        Plaintiff Wendy V. brings this action pursuant to the Social Security Act, 42 U.S.C. §

405(g), for review of a final determination by the Commissioner of Social Security denying

her application for benefits for a period of disability.  Plaintiff alleges that the

Administrative Law Judge's ("ALJ") decision denying her application was not supported by

substantial evidence and contrary to the applicable legal standards.  Pursuant to Northern

District of New York General Order No. 8, the Court proceeds as if both parties had

accompanied their briefs with a motion for judgment on the pleadings.

**I.      BACKGROUND**

        Plaintiff Wendy V. filed this action pursuant to 42 U.S.C. § 405(g) to appeal the

Defendant Commissioner of Social Security's denial of her claim for disability benefits.

Plaintiff filed her claim for Supplemental Security Income Benefits ("SSI") on August 24,

1

2020.  See Social Security Administrative Record ("R"), dkt. # 9, at 179-185.

After an initial determination denied her application, Plaintiff worked with a legal representative and appealed the decision.  See R. at 18-178.  After a hearing, Administrative Law Judge ("ALJ") Robyn L. Hoffman denied Plaintiff's request for benefits in a written decision.  Id. at 11-23.  The Social Security Appeals Council denied Plaintiff's appeal.  Id. at 1-4.  Plaintiff filed the instant action on November 11, 2022.  See dkt. # 1. After the Court received the administrative record, the parties filed briefs in support of their positions.  See dkt. #s 10, 14.  Plaintiff filed a reply.  See dkt. # 15.  The matter is now before the Court

## II.    FACTS

The Court will assume familiarity with the facts and set forth only those facts relevant to the Court's decision in the body of the decision below.

## III.   THE ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ used the five-step sequential evaluation process outlined in the Social Security regulations to determine whether Plaintiff was disabled within the meaning of the Social Security Act.  R. at 12-23.  As the ALJ explained the process, "[a]t step one," the judge "must determine whether the claimant is engaging in substantial gainful activity" within the meaning of 20 CFR 416.920(b).  Id. at 12.  "At step two," the judge "must determine whether the claimant has a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe'" within the meaning of 20 CFR 416.920(c). Id.  If the judge makes this finding, the analysis continues to step three, where the judge "must determine whether the claimant's impairment or combination of impairments is of a

severity to meet or medically equal the criteria of an impairment listed in" the federal regulations.  Id.  If the judge finds an impairment meets this criteria, the claimant is disabled within the meaning of the act.  "If it does not, the analysis continues to step" four. Id.  "Before considering step four," the judge "must first determine the claimant's residual functional capacity," which "is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments."  Id. at 13.  Moving then to step four, the judge considers "whether the claimant has the residual functional capacity to perform the requirements of her past relevant work."  Id.  A person with the ability to perform past relevant work is not disabled.  Id.  "If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step."  Id.  At that last step, the judge "must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience."  Id.  A person who can do other work is not disabled.

At step one, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since the date of her application for benefits.  Id.  At step two, the ALJ found that Plaintiff suffered from the serve impairments of post-traumatic stress disorder ("PTSD") and major depressive disorder.  Id.  ALJ concluded that "[t]he record contains clinical and diagnostic findings showing that the above impairments have more than minimally affected the claimant's ability to perform basic work activities during the relevant period."  Id.  The ALJ found no evidence of other severe impairments.  Id.

At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal the relevant criteria of one of the listed impairments.  Id. at 14.  The ALJ also found that none of Plaintiff's impairments were extreme within the meaning of the regulations.

3

<u>Id.</u>  The ALJ described Plaintiff's impairments and whether the record supported her claimed limitations.  <u>Id.</u> at 14-17.  The ALJ found that "[t]he claimant has reported having problems paying attention; concentrating; following spoken instructions; completing tasks; getting along with others, including authority figures; and handling stress and changes in routine."  <u>Id.</u> at 14.  Plaintiff also reported that she did not enjoy crowds and was "'afraid to walk anywhere alone.'" <u>Id.</u>  She is "afraid to 'be by [her]self,'" and she "'cannot be followed in any way.'" <u>Id.</u>  Plaintiff alleged that she stayed inside like "'a hermit'" because of her fears of the outside.  <u>Id.</u>  She also claimed to have "the attention span and concentration" of "'a five-year-old.'" <u>Id.</u>  Plaintiff reported severe panic attacks that occurred multiple times each week.  <u>Id.</u>  Such attacks could be triggered by "'nightmares, flashbacks, loud noises and gathering of people.'" <u>Id.</u> Plaintiff could not socialize, she claimed, with more than three people at a time.  <u>Id.</u>

At her hearing, Plaintiff testified to having "'more depressed days than good days.'" <u>Id.</u> at 15.  If depressed, Plaintiff stated, she would just remain in bed.  <u>Id.</u>  "'[A]nything,'" Plaintiff claimed, could trigger her depression, like "'the slightest bit of loud noise.'" <u>Id.</u> Plaintiff reported that she had a bout of depression "'a couple of days ago,'" and also claimed that her depression could cause her to stay in bed "'up to a week and half'" at a time.  <u>Id.</u>  Depression could also cause Plaintiff not to shower for two weeks.  <u>Id.</u>

While Plaintiff testified that she was often depressed, she also testified that she was "paranoid, 'jumpy,' and has nights during which she cannot 'sleep whatsoever.'" <u>Id.</u> She alleged she had nightmares as many as four times each week.  <u>Id.</u>  The nightmares woke her up, and she would need more than an hour to fall back asleep, if she could.  <u>Id.</u> Plaintiff testified that such events left her feeling "'drained'" the next day.  <u>Id.</u>  Though

4

Plaintiff testified that she had a "'good memory,'" she also claimed to have "a 'very, very

short attention span when it comes to trying to read or watch a movie, or even watch

something on TV.'"  Id.  Plaintiff also testified that she had flashbacks and panic attacks.

Id.  The flashbacks allegedly happened four or five times a week, and were triggered by

loud noises or "'people talking about the incident.'"  Id.  Panic attacks made Plaintiff feel

like someone was sitting on her chest and like having a heart attack.  Id.  They allegedly

occurred two or three times a week and could take three-and-half to four hours to recover

from.  Id.  Plaintiff testified that her paranoia made her afraid to be outside and caused her

to spend most of her time in her room.  Id.  She testified that she did not feel safe

anywhere but at home.  Id.  Plaintiff also feels that people are out to get her and that she

is being watched or followed.  Id.  Plaintiff testified that she limited her interaction to a

therapist and did not want to "have 'any interaction with anybody.'"  Id.

> The ALJ noted that, despite this testimony:

> the claimant lives in an apartment with her boyfriend and his two children, who were
> nine and eleven years old as of the date of the hearing (Testimony).  She indicated
> in her function report that she helped the children "with their schooling" and made
> sure the pets were "properly cared for" (3E/6).  The claimant reported that she found
> cooking relaxing and that she tried to prepare a "three-course meal" "daily"
> (3E/7).  She also reported that she spent "one hour a day" washing dishes,
> sweeping, mopping, and dusting without help or management (3E/7).  The claimant
> indicated that she could handle money and shopped for food in stores once a
> month and it took her two hours (3E/8).  The claimant admitted that she uses public
> transportation (3E/8, Testimony).  She testified that her boyfriend works during the
> day, so she uses Uber or Lyft when she can afford it.  Otherwise, she takes a bus
> (Testimony).  The claimant also indicated in her function report that she texts other
> people "daily" and watches television and/or plays games "all the time" (3E/9).

Id.  The ALJ also found that Plaintiff's function report contrasted her claimed limitations.  Id.

at 16.  The report stated that she could engage in conversation, do chores, read, and

watch movies.  Id.  She claimed in the report that she could follow instructions "'well.'"  Id.

Plaintiff also reported that she had no problems getting along with family, friends, and neighbors.  Id.  Plaintiff also reported to her therapist that she had friends, but expressed fear that her friends took advantage of her kindness; she became an "'unpaid babysitter for their children.'"  Id.  Plaintiff also told her therapist that she had tried to find employment for a while but had not received any callbacks.  Id.  Plaintiff also told a consulting psychiatrist that "she could bathe, dress, and groom herself," as well as cook, clean, do laundry, shop, manage money, and take public transportation.  Id.  While she reported a lack of motivation to get dressed or bathe on some days, plaintiff like to write in a journal, listen to music, and watch tv.  Id.  She also reported she spent her days cleaning and caring for the children.  Id.

The ALJ also noted that Plaintiff has never been hospitalized for psychiatric issues, and does not take any medication.  Id.  The consulting psychiatrist found Plaintiff's demeanor and responsive and cooperative, and her communication, social skills, and overall demeanor "adequate."  Id.  Plaintiff appeared "'fairly groomed'" and made "appropriate eye contact and exhibited normal posture and motor behavior."  Id.  Plaintiff told the consultant that she had been having an "'up and down day,'" but still had a normal affect, and a "thought process" that was "coherent and goal directed."  Id.  The consultant saw "no evidence of hallucinations, delusions, or paranoia."  Id.  Plaintiff had "intact" attention and concentration, and her memory was "only 'mildly impaired due to distractibility.'"  Id.  She had an average intelligence, "'fair'" insight, and "'good'" judgment. Id.  The consultant found that Plaintiff "had 'moderate' limitations for understanding, remembering, and applying complex directions and instructions; interacting adequately with supervisors, coworkers, and the public, regulating emotions; controlling behavior; and

maintaining well-being." Id.  He found only "'mild'" limitations in other areas.  Id. at 16-17.

The consultant "also concluded that the claimant's psychiatric problems were not

significant enough to interfere with her ability to function on a daily basis."  Id. at 17.

 The ALJ also pointed to the opinions of "two state agency psychologists" who found

that plaintiff "had only 'mild' limitations in all four broad areas of mental functioning."  Id.

While Plaintiff's therapist in October 2021 had found greater limitations than these

examiners, concluding that Plaintiff could not "'meet competitive standards'" and "'had no

useful ability to function,'" the ALJ found that "the other medical opinions and the

claimant's treatment history, mental status exams, and even some of her own statements

about her activities and abilities do not support the level of limitation proposed in this

assessment."  Id.

 As such, the ALJ concluded Plaintiff:

> has no more than the following degree of limitation: mild difficulties in
> understanding, remembering, or applying information; moderate difficulties in
> interacting with others; mild difficulties in concentrating, persisting, or maintaining
> pace; and mild difficulties in adapting or managing oneself.

Id.  The ALJ thus concluded that the criteria for finding a listed impairment was not

satisfied, but considered the limitations she found in crafting Plaintiff's "residual functional

capacity."  Id.

 At step four, the ALJ found that Plaintiff had "the residual functional capacity to

perform a full range of work at all exertional levels."  Id.  In terms of her mental state,

Plaintiff "retains the ability to understand and follow simple instructions and directions,

perform simple tasks independently, maintain attention/concentration for simple tasks, and

regularly attend to a routine and maintain a schedule."  Id.  Plaintiff could also "handle

simple, repetitive, work-related stress in that she can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that do not require her to supervise or manage the work of others.  She can tolerate occasional contact with the public."  Id. at 17-18.

The ALJ explained that she followed a two-step process in evaluating the Plaintiff's symptoms.  Id. at 18.  First, she asked "whether there is an underlying medically determinable physical or mental impairment(s)–i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques–that could reasonably be expected to produce the claimant's pain or other symptoms."  Id.  If the evidence showed such an impairment or impairments, the ALJ "must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities."  Id.

The ALJ noted that Plaintiff "has alleged disability due to mental impairments that she claims have limited her ability to pay attention, concentrate, follow spoken instructions, complete tasks, get along with others, including authority figures, and handle stress and changes in routine."  Id. (cleaned up).  The ALJ summarized the evidence discussed above about Plaintiff's claims in her function reports and testimony about the limitations her mental conditions caused.  Id.  After summarizing these claims, the ALJ concluded that:

> in evaluating the claimant's work-related abilities, I have considered the claimant's alleged symptoms and the effects they purportedly had on her daily functioning. however, the record as a whole does not support limitations beyond those provided for within the above-found residual functional capacity.  Therefore, the claimant's allegations [sic] have been found to affect her ability to work only to the extent that they can reasonably be accepted as consistent with the objective medical and other evidence or record.

8

Id. at 19.

The ALJ then evaluated the opinion evidence.  She found the assessments of state

agency psychologists S. Hennessey, PhD, and P. Fernandez, PhD, "persuasive insofar as

they are consistent with one another and supported by detailed narrative analyses that

include references to several of the claimant's allegations and statements regarding her

symptoms and activities, the claimant's treatment history, and some of the claimant's

mental status exams."  Id. Still, the ALJ was not persuaded fully by these opinions.  Id.

She concluded that "other evidence in the record supports somewhat greater limitations."

Id.

The ALJ pointed to the opinion of Dr. Gregory Fabiano, PhD, the consultative

psychiatrist discussed above.  Id.  Dr. Fabiano concluded that Plaintiff had some moderate

limitations in some areas of functioning, and mild limitations in others.  Id. at 19-20.  "He

also concluded that the claimant's psychiatric problems were not significant enough to

interfere with her ability to function on a daily basis."  Id.  The ALJ found this opinion

"partially persuasive."  Id. at 20.  She concluded that:

> His finding of some "moderate" limitations is unsupported by his largely normal
> clinical exam and inconsistent with his conclusion that claimant's psychiatric
> problems are not significant enough to interfere with her ability to function on a daily
> basis (2F).  However, the claimant has consistently attended psychotherapy since
> her alleged onset date, and it appears that all her sessions were either telehealth
> visits or were conducted within her own home.  I also note the claimant's mental
> status exams have at least occasionally noted an anxious mood. (3F/8; 4F/4, 6).
> Based on this evidence, along with the claimant's subjective complaints, I find it
> reasonable to conclude she has more than "mild" limitations in social functioning.
>
> However, I find nothing in the record that persuades me the claimant is unable to
> perform simple, repetitive, unskilled work tasks on a sustained basis or that she
> cannot tolerate at least occasional contact with the public.

Id.  The ALJ pointed out that Plaintiff lived in apartment with her boyfriend and his two

children.  Id.  Plaintiff reported that she helped the children with their school work, cared

for pets, cooked meals, and did chores "without help or encouragement."  Id.  Plaintiff

could "handle money, went food shopping, and used public transportation."  Id.  She

texted other people and watched television and played games daily.  Id.  The ALJ pointed

to statements by Plaintiff in her function report that showed she could engage in various

household activities, and pointed to Plaintiff's treatment notes to indicate that she

sometimes looked after children for more than eight hours at a time, including late into the

night.  Id.  Plaintiff also reported that she had "'suppl[ied] multiple meals a week for the

children.'"  Id.  Plaintiff's mother also lived with her briefly, the ALJ pointed out.  Id.  Plaintiff

also planned a party in September 2020.[1]  Id.  She was upset that people who had

promised to come did not attend and bring food to share, since that caused Plaintiff to

spend more money to provide food at the party.  Id.  The ALJ also noted that "[d]espite her

reported problems, the claimant has never been psychiatrically hospitalized, and she

testified that she takes no medication."  Id. at 21.  Mental status exams, "other than some

occasional anxiety," the ALJ also found "have been unremarkable."  Id.

The ALJ also evaluated the opinion of LMSW Courtney Bartlett, who treated

Plaintiff's mental health issues.  After explaining the opinions of other examiners,

discussing Plaintiff's statements and testimony, and referencing Plaintiff's treatment

_____

[1]The party was in memory of a son who had died.  The ALJ did not include an earlier treatment record that provides more insight on the reason for this party.  A treatment record from September 10, 2020 indicates that "Wendy reports over the weekend she and her fiancé are having a celebration of life for their son who was murdered as it is his birthday.  She processed through some of the trauma of his death as well as the fact she was also shot in the stomach that night.  Wendy reports she has many 'should have, would have, could haves' related to the night of her son's murder and that it is something she thinks about often."  R. at 306.

records, the ALJ concluded that:

> It is for these and other reasons that I am unpersuaded by Ms. Bartlett's medical opinion (5F). Again, Ms. Bartlett opined that the claimant was either "unable to meet competitive standards" or had "no useful ability to function" in all but one area of work-related mental functioning. This extreme level of limitation is not consistent with the claimant's activities or supported by her mostly normal mental status exams. This includes the mental status exams that were conducted by Ms. Bartlett. Throughout most of 2021, Ms. Bartlett found the claimant's mood "euthymic" and her general appearance, dress, behavior, and thought content "appropriate" (4F). She also found the claimant's memory intact and assessed her attention/concentration as "good" and her insight, judgment, and impulse control as "excellent." I note that Ms. Bartlett inconsistently opined that the claimant could not meet competitive standards for maintaining socially appropriate behavior and had no useful ability to interact appropriately with the general public but retained a "limited but satisfactory" ability to use public transportation (5F/2). Her report that the claimant had experienced only one 'good day' every three weeks for the past 14 months (5F/3) is inconsistent with the claimant's sworn testimony and other statements. I also find Ms. Bartlett's assessment of the claimant's ability to manage stress, remain on task, and maintain attendance inconsistent with the claimant's activities, mental status exams, and treatment history. Again, the claimant has reported planning parties, taking care of her boyfriend's children, and babysitting her friend's children, including a three-month-old baby (1F/38), sometimes for more than eight hours at a time. Her mental status exams have repeatedly noted intact memory, "good" attention/concentration, and "good" or better instincts and judgment/impulse control (1F, 4F). And lastly, there is nothing in the claimant's treatment records indicating she failed to attend her therapy sessions as scheduled.[2]

Id. at 21-22.

In the end, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms," but that her claims about "the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence of record." Id. at 22. Thus, the ALJ found that Plaintiff "retains the residual functional capacity to perform work

---

[2]The Courts notes that all of the treatment notes provided to the Court indicate that the therapy sessions involved occurred via "telehealth." See R. 271-344, 401-531.

activities within the limitations set forth above."  Id.

At the final step of the sequential process, the ALJ concluded that Plaintiff did not have any past relevant work, that Plaintiff was a 34, and thus a "younger individual" under the Social Security regulations, had at least a high-school education, and did not have transferrable job skills.  The ALJ found that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  Id.

After finding that "the claimant retains all the basic mental abilities required to perform unskilled wok on a sustained basis," the ALJ opined the "the testimony of a vocational expert is not necessary."  Id. at 23.  The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  Id.

## IV.    STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries.  See 42 U.S.C. § 405(g).  First, the Court determines whether the Commissioner applied the correct legal standard.  See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990); Shane v. Chater, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997)(Pooler, J.)(citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).  Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record.  See Tejada, 167 F.3d at 773; Balsamo, 142 F.3d at 79; Cruz, 912 F.2d at 11; Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).  A Commissioner's finding will be deemed conclusive if supported by substantial

evidence. See 42 U.S.C. § 405(g); see also Perez, 77 F.3d at 46; Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine *de novo* whether a Plaintiff is disabled.  The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.")(citations omitted).

In the context of Social Security cases, substantial evidence consists of "more than a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)).  Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. See Quinones v. Chater, 117 F.3d 29, 36 (2d Cir. 1997)(citing Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)); Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990).  Although the reviewing court must give deference to the Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately "'a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'" Vargas v. Sullivan, 898 F.2d 293, 296 (2d Cir. 1990)(quoting Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983)).

## V.    ANALYSIS

Plaintiff seeks remand on two bases, which the Court will address in turn.

### A.    Evaluation of the Opinion Evidence

Plaintiff first argues that the ALJ erred in her assessment of Plaintiff's RFC by improperly evaluating the opinion evidence.  Plaintiff notes that her therapist, Bartlett,

13

found that Plaintiff's ability to perform daily work activities "independently, appropriately, and effectively . . . was less than satisfactory and, in some regards, completely precluded." Plaintiff's Brief, dkt. # 10, at 7.  Bartlett opined that Plaintiff lacked the ability "to maintain basic standards, stick to a schedule, or consistently complete tasks." Id.  Bartlett also opined that Plaintiff would be off-task twenty percent of the time, and would be absent multiple days per week. Id. at 7-8.  Plaintiff argues that the ALJ's finding that the opinion was unpersuasive was "error." Id. at 8.

Bartlett prepared her opinion on October 20, 2021.  R. at 535.  Bartlett's Medical Source Statement diagnoses Plaintiff with post-traumatic stress disorder. Id. at 532.  One section of that form directs the person who prepares the form to check whether a patient has "signs and symptoms." Id.  Bartlett checked boxes showing that Plaintiff had symptoms of: anhedonia or pervasive loss of interest in almost all activities; decreased energy; blunt, flat or inappropriate affect; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, [which] are a source of marked distress; paranoid thinking or inappropriate suspiciousness; emotional withdrawal or isolation; impulsive and damaging behavior; impairment in impulse control; emotional lability; deeply ingrained, maladaptive patterns of behavior; persistent disturbances of mood or affect; easy distractibility; memory impairment–short, intermediate or long term; sleep disturbance; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. Id.

The next section of the form asks the evaluator to "determine your patient's ability

14

to do *work-related activities on a day-to-day basis in a regular work setting*" and asked the person completing the form to "[c]onsider the medical history, the choronicity of findings (or lack thereof), and the expected duration of any work-related limitations[.]" Id. at 533. The form then asked the evaluator to rate the patient's "mental abilities and aptitude needed to do particular types of jobs." Id. Bartlett found that Plaintiff was "unable to meet competitive standards" in a number of categories: remember work-like procedures; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in a routine work setting; be aware of normal hazards and take appropriate precautions; maintain socially appropriate behavior; and travel in an unfamiliar place. Id. Bartlett found that Plaintiff had "no useful ability to function" in a number of other categories: understand and remember very short and simple instructions; carry out very short and simple instructions; maintain attention for a two hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without strict supervision; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; deal with normal work stress; interact appropriately with the general public; and adhere to basic standards of neatness and cleanliness. Id. Bartlett did opine that Plaintiff had a "limited but satisfactory" ability to use public transportation. Id.

The form asked the evaluator to "[e]xplain limitations falling in the three most limited

categories above . . . and include the medical/clinical findings that support this

assessment." Id. Bartlett wrote that:

> Wendy has a difficult time to attend therapy.  She is often still in pajamas and laying in bed to complete sessions at 7pm at night.  It does not clinically appear she would be able to manage maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, stick to a schedule, and respond/interact/get along with her coworkers or supervisory staff.  In even the most brief conversations I have with Wendy, she cannot maintain focus and she cannot regulate steady and consistent moods.  To have her complete a task, I have to remind her multiple times–I call or text her outside of session to provide reminders and it can takes weeks or months for her to follow these simple step directions I have provided.  There is no consistency even when she tries.  She does not handle stressors well–this is something we have worked on since July 2020 with a 3-5% improvement.  Wendy and I continued to work through processing her trauma and finding new coping strategies.  She does engage in therapy and want to be able to work or function "normally" day to day but at this time, and for the foreseeable future, her PTSD is severe and she is unable to do so.

Id. at 533-34.  In describing Plaintiff's treatment, Bartlett related that "I have prescribed

therapy twice a week for 1 hour.  Wendy has utilized therapy as many as four times in a

week but usually three times a week when she is having even more so heightened PTSD

symptoms.  This would not be manageable with a job whatsoever." Id. at 534.

In responding to questions about Plaintiff's mental state and how that state would

effect Plaintiff's ability to work, Bartlett affirmed that Plaintiff had "repeated episodes of

deterioration or decompensation in work or work-like settings which cause the patient to

withdraw from the situation or experience exacerbation of signs and symptoms (including

deterioration of adaptive functioning)." Id.  Bartlett also affirmed that Plaintiff had

"deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in

a timely manner (in a work setting or elsewhere)[.]" Id.  Bartlett reported that Plaintiff would

be off task–"unable to maintain attention or perform at a consistent pace"–more than 20%

of the work day.  In affirming that Plaintiff had "good days" and "bad days," Bartlett added

that "[t]o be clear, Wendy does have some 'good days.'  They appear to be about one day every 3 weeks over the past 14 months."  Id.  Bartlett also reported that, on average, Plaintiff would miss more than four days per month of work due to her condition.  Id. at 534.  When asked to describe "other limitations that would affect your patient's ability to work at a regular job on a sustained basis" Bartlett opined that "Wendy experiences a random onset of PTSD flashbacks where it becomes so vivid she feels like she is re-experiencing the trauma in that exact moment.  She suffers from panic attacks at times and has long bouts of irritability and frustration which can impede her ability to focus and concentrate on anything."  Id.

For claims made after March 27, 2017, the ALJ is to consider the opinion evidence pursuant to the rules stated in 20 C.F.R. § 404.1520c.  Under that regulation, the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding[s], including those from your medical sources."  20 CFR § 404.1520c(a).  The Administration applies factors laid out in 20 CFR §§ 404.1520c(c)(1)-(c)(5) in evaluating such opinions.  Id.  Those factors consider the medical opinion's:  "(1) supportability"; "(2) consistency"; the author's "(3) relationship with the claimant," including the "length of the treatment relationship," "frequency of examinations," "purpose of the treatment relationship," "extent fo the treatment relationship," and whether the opinion author examined the claimant; (4) the "[s]pecialization" of the opinion author; and (5) other relevant factors, such as the author's familiarity with the underlying evidence or the rules of the disability program.  20 CFR §§ 404.1520c(c)(1)-(c)(5).

"Although the new regulations eliminate the perceived hierarchy of medical sources,

deference to specific medical opinions, and assigning 'weight' to a medical opinion, the

ALJ must still 'articulate how [he or she] considered the medical opinions' and 'how

persuasive [he or she] find[s] all of the medical opinions.'" Jeremy B. v. Comm'r of Soc.

Sec., No. 8:20-CV-818 (TWD), 2022 WL 798056, at *3 (N.D.N.Y. Mar. 16, 2022)(quoting

20 C.F.R. §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1)).  "The two 'most important

factors for determining the persuasiveness of medical opinions are consistency and

supportability,' which are the 'same factors' forming the foundation of the treating source

rule."  Id. (quoting *Revisions to Rules*, 82 Fed. Reg. 5844-01 at 5853).

> An ALJ is specifically required to "explain how [he or she] considered the
> supportability and consistency factors" for a medical opinion. 20 C.F.R. §§
> 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new
> regulations provide "[t]he more relevant the objective medical evidence and
> supporting explanations presented by a medical source are to support his or
> her medical opinion(s) or prior administrative medical finding(s), the more
> persuasive the medical opinions or prior administrative medical finding(s) will
> be." *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide with
> respect to "consistency," "[t]he more consistent a medical opinion(s) or prior
> administrative medical finding(s) is with the evidence from other medical
> sources and nonmedical sources in the claim, the more persuasive the
> medical opinion(s) or prior administrative medical finding(s) will be." *Id.* §§
> 404.1520c(c)(2), 416.920c(c)(2).
>
> Under the new regulations an ALJ must consider, but need not explicitly
> discuss, the three remaining factors in determining the persuasiveness of a
> medical source's opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). However,
> where the ALJ has found two or more medical opinions to be equally well
> supported and consistent with the record, but not exactly the same, the ALJ
> must articulate how he or she considered those factors contained in
> paragraphs (c)(3) through (c)(5). *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3).

Id. at *3-*4.

"Although the treating physician rule found in prior regulations is inapplicable to this

case, a recent survey of district court cases in the Second Circuit applying the amended

regulations recognized many of the factors to be considered in weighing the various

medical opinions in a given claimant's medical history are substantially similar." Id. at *8

(citing Cuevas v. Comm'r of Soc. Sec., No. 20-CV-502 (AJN)(KHP), 2021 WL 363682, at

*9 (S.D.N.Y. Jan. 29, 2021) (collecting cases)). "For example, '[e]ven though ALJs are no

longer directed to afford controlling weight to treating source opinions – no matter how well

supported and consistent with the record they may be – the regulations still recognize the

'foundational nature' of the observations of treating sources, and 'consistency with those

observations is a factor in determining the value of any [treating source's] opinion.'" Id.

(quoting Raymond M. v. Comm'r of Soc. Sec., No. 5:19-CV-1313 (ATB), 2021 WL 706645,

at *9 (N.D.N.Y. Feb. 22, 2021), in turn quoting Shawn H. v. Comm'r of Soc. Sec., No.

2:19-CV-113, 2020 WL 3969879, at *6 (D. Vt. July 14, 2020)). "As the amended

regulations note, '[a] medical source may have a better understanding of your

impairment(s) if he or she examines you than if the medical source only reviews evidence

in your folder.'" Id. (quoting 20 C.F.R. §§ 404.1520c(c)(3)(v), 416.920c(c)(3)(v)).

Plaintiff argues that the ALJ erred in her evaluation of the supportability and

consistency of Bartlett's opinion.  She contends that ALJ erred in finding that the opinion is

inconsistent.  ALJ's are supposed to evaluate the consistency of the opinion with the

medial and nonmedical evidence in the record, not the internal consistency of the opinion.

Moreover, to the extent that the ALJ finds that Bartlett's opinion of Plaintiff's limitation is

not consistent with her findings of Plaintiff's mental status, Plaintiff argues that the ALJ

misstates the record and ignores portions of the treatment record that support Bartlett's

opinion.  Plaintiff also argues that the ALJ's finding that Bartlett's limitations are

inconsistent with the conclusions of the other examiners is not supported by the record, at

least as far as Dr. Fabiano's opinion goes.  Plaintiff points out that Dr. Fabiano found

limitations to basic mental demands, even though his mental status examination showed mostly benign results.  The ALJ's implication that Plaintiff's lack of pharmaceutical interventions shows only moderate limitations is not supported by Dr. Fabiano's conclusion that Plaintiff's treatment with trauma-informed cognitive behavioral therapy was appropriate.   Finally, Plaintiff argues that the ALJ's opinion that Plaintiff's ability to function in certain activities of daily living is not consistent with the restrictions Bartlett placed on Plaintiff's ability to function in work-related settings.  Plaintiff argues that the Social Security regulations explicitly recognize that people with mental-health limitations may be able to function better in environments they can control than in the workplace.

The Defendant responds that the medical records and opinions of other experts support the weight that the ALJ assigned to Bartlett's opinion.  The government notes that other examiners had found only limited impairments of Plaintiff's mental functions, and that Bartlett's own notes frequently had notations that Plaintiff had good attention and concentration, behaved appropriately, and had normal thoughts, speech, memory, insight, judgment, and impulse control.  Plaintiff's daily activities of caring for children, cooking, cleaning, babysitting, shopping, and taking public transportation also supported the ALJ's assessment that Plaintiff's limitations were not as severe as Bartlett reported.  While Plaintiff may disagree with the ALJ's findings, the government argues, she has not shown that substantial evidence does not exist to support them.

The Court agrees with the Plaintiff that the ALJ assigned improper weight to Bartlett's opinion.  As explained, the ALJ found that:

> It is for these and other reasons that I am unpersuaded by Ms. Bartlett's medical opinion (5F).  Again, Ms. Bartlett opined that the claimant was either "unable to meet competitive standards" or had "no useful ability to function" in all but one area

of work-related mental functioning.  This extreme level of limitation is not consistent with the claimant's activities or supported by her mostly normal mental status exams.  This includes the mental status exams that were conducted by Ms. Bartlett.  Throughout most of 2021, Ms. Bartlett found the claimant's mood "euthymic" and her general appearance, dress, behavior, and thought content "appropriate" (4F).  She also found the claimant's memory intact and assessed her attention/concentration as "good" and her insight, judgment, and impulse control as "excellent."  I note that Ms. Bartlett inconsistently opined that the claimant could not meet competitive standards for maintaining socially appropriate behavior and had no useful ability to interact appropriately with the general public but retained a "limited but satisfactory" ability to use public transportation (5F/2).  Her report that the claimant had experienced only one 'good day' every three weeks for the past 14 months (5F/3) is inconsistent with the claimant's sworn testimony and other statements.  I also find Ms. Bartlett's assessment of the claimant's ability to manage stress, remain on task, and maintain attendance inconsistent with the claimant's activities, mental status exams, and treatment history.  Again, the claimant has reported planning parties, taking care of her boyfriend's children, and babysitting her friend's children, including a three-month-old baby (1F/38), sometimes for more than eight hours at a time.  Her mental status exams have repeatedly noted intact memory, "good" attention/concentration, and "good" or better instincts and judgment/impulse control (1F, 4F).  And lastly, there is nothing in the claimant's treatment records indicating she failed to attend her therapy sessions as scheduled.

The Court finds the ALJ's evaluation of this opinion does not meet the supportability and consistency factors and will remand to the ALJ for reconsideration of the weight to assign that opinion and reconsideration of the RFC originally assigned.  The Court finds that the ALJ ignored evidence in Bartlett's treatment records that supported Bartlett's opinion.  In that way, she lacked substantial evidence for her finding the opinion was unpersuasive.  The ALJ, for instance, concluded that Bartlett's mental status assessments consistently found Plaintiff's mental health situation well-regulated and well controlled, and cites to pages from the treatment records to support that finding.  The Court notes, however, that the ALJ's frequent citation of status findings that indicate the Plaintiff was "oriented/Alert" had an "euthymic" mood, was intact in her functional status, and an "appropriate" affect, and was interpersonally "interactive" all come from a particular portion

of the treatment notes labeled "patient presentation."  See, e.g., R. at 272.  All of those

findings ignore, however, a section of the progress notes that follows soon after this

section: "Symptom Description and Subjective Report."  Id.  In that section, Bartlett

describes the actual treatment session.  As just one example out of dozens, on November

9, 2020, at a session that lasted from 7:15pm-8:15pm, Bartlett reported "Wendy continues

to voice that she would like to work but feels conflicted as she knows it is not in her best

interested [sic]."  Id.  Bartlett "processed" that issue with Plaintiff, noting that "Wendy

demonstrates memory problems, lack of concentration, historically poor relationships with

others, trouble staying awake due to insomnia at night due to PTSD related nightmares,

fear, anxiety, panic attacks, emotional outbursts, flashbacks, and when she was working

absenteeism due to trouble managing PTSD symptoms."  Id.  Plaintiff and Bartlett agreed

that the two should continue to work on a "coping skills toolbox" with the hope of her

becoming capable of working.  Id.

        The Court has examined the treatment notes in the record, which cover a period

from July 2, 2020 to October 8, 2021, and finds that the reports in the notes provide

support for Bartlett's findings of severe limitations.  Bartlett's opinion, particularly the notes

she added to that opinion about the Plaintiff's anxiety and appearance at telehealth

sessions, find support in the records, which indicate multiple sessions per week, often in

the evening.  On remand, the ALJ should explain why formulaic notes on mental status

outweigh reports in the record of severe trauma, a limited ability to interact with the

general public, and frequent statements by both Bartlett and Plaintiff of Plaintiff's inability

to interact appropriately in public.  The ALJ should also explain why Bartlett's role as a

provider who cared for Plaintiff multiple times over a week for more that a year offers less

insight into Plaintiff's ability to function than the observations of consultants who saw her once or simply examined the medical record.  See, e.g., Estrella v. Berryhill, 925 F.3d 90, 98 (2d Cir. 2019) ("We have frequently 'cautioned that ALJs should not rely heavily on findings of consultative physicians after a single examination.  This concern is even more pronounced in the context of mental illness where . . . a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health.") (quoting Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013) (internal citation omitted)).

Moreover, the ALJ improperly cited to Plaintiff's reports that she engaged in certain activities at home to find Bartlett's opinions on Plaintiff's inability to work unsupported by the record.  The Second Circuit Court of Appeals has noted that "'[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.'" Estrella, 925 F.3d at 97 (quoting Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014)).  While the ALJ did not necessarily "cherry-[pick] particular instances of improvement . . . to create an inconsistency within [a] medical opinion," the ALJ's use of activities in the home to contradict Bartlett's findings about Plaintiff's ability to function outside the home represents a similar problem.  On remand, if the ALJ finds that Plaintiff's activities of daily living contradict Bartlett's finding that Plaintiff cannot operate in a workplace, the ALJ should explain–given Plaintiff's mental health status–why Plaintiff's ability to engage in some activity in the household and limited ability to use public transportation contradicts Bartlett's finding that Plaintiff's mental health prevents her from having the concentration, energy, ability to deal with normal workplace stress, and interact

with the public necessary to maintain employment.

**B.    Failure to Use a Vocational Expert**

Plaintiff also argues that ALJ erred by failing to use a vocational expert to determine whether jobs existed in the significant numbers in the national economy for a person with Plaintiff's RFC and age, education and work experience.  Plaintiff contends that the Social Security regulations require use of a vocational expert in circumstances like this one, where the ALJ finds no exertional limitations but finds non-exertional limitations. Defendant denies that such a requirement exists in every case, arguing that "the determination about whether the Medical-Vocational Guidelines may be applied 'must be determined on a case-by-case basis.'" Defendant's Brief, dkt. # 14, at 19 (quoting Bapp v. Bowen, 502 F.2d 601, 605 (2d Cir. 1986)).

The parties thus agree that the need for a vocational expert depends on the ALJ's RFC finding.  Because the Court has determined that the case should be remanded to the ALJ for reconsideration of the weight assigned to Bartlett's opinion, the Court will not address that issue at this time.  If the ALJ determines to assign more weight to Bartlett's opinion, the RFC will likely change, and the parties may then agree on the need for a vocational expert in this matter.

**VI.    Conclusion**

For the reasons stated above, Plaintiff's motion for judgment on the pleadings, dkt. # 10, is hereby GRANTED.  The Defendant's motion for judgment on the pleadings, dkt. # 14, is hereby DENIED.  The case is REMANDED to the Commissioner for proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**Dated: March 12, 2024**

Lawrence E. Kahn
Senior U.S. District Judge